UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

STATE OF NEW YORK and BASIL SEGGOS, as :
Commissioner of the New York State Department :        **Case No. 2:20-cv-244**
of Environmental Conservation,                  :
                                                :
      Plaintiffs,                              :        **COMPLAINT**
                                                :
        - against -                        :
                                                :
K. B. K. HUNTINGTON CORP. and STEPHEN           :
BIRCHELL,                                       :
                                                :
      Defendants.                              :
                                                :
------------------------------------------------------------------ x

      Plaintiffs State of New York and Basil Seggos, in his capacity as Commissioner of the New York State Department of Environmental Conservation ("DEC") (together, the "State"), by their attorney Letitia James, Attorney General of the State of New York, as and for their Complaint, allege as follows, upon information and belief:

## NATURE OF THE ACTION

      1.  This is an action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 ("CERCLA"), as amended, to recover costs that have been and will be incurred by the State in responding to the release of hazardous dry cleaning chemicals into the environment at and from the premises located at 410 West Main Street in Huntington, New York (the "Site").

      2.  This action seeks recovery of: (a) the State's response costs incurred to date; and (b) a declaration of liability for the State's future response costs.

## JURISDICTION AND VENUE

3.  This Court has exclusive jurisdiction over this action, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613.  The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

4.  Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release of hazardous substances that gives rise to this action occurred within this District and the Site is located within this District.

## THE PARTIES

5.  Plaintiff the State of New York brings this action to recover costs that have been and will be incurred by the State in responding to the release of hazardous substances at and from the Site.

6.  Plaintiff Basil Seggos is the Commissioner of the New York State Department of Environmental Conservation.  Commissioner Seggos brings this action in his official capacity to recover costs that have been incurred and will be incurred by DEC in responding to the release of hazardous substances at and from the Site.

7.  Defendant Stephen Birchell is the founder and former owner and principal of non-party Main Street Cleaners, Inc. ("Main Street Cleaners"), a now-dissolved New York corporation.  Birchell managed and directed Main Street Cleaners' dry cleaning operations at the Site, including operations related to the disposal of hazardous substances at the Site, from approximately 1965 through 1975.  Main

2

Street Cleaners continued to conduct dry cleaning operations at the Site until approximately 2006 and was dissolved in 2009.[1]

8.   Birchell also owns defendant K. B. K. Huntington Corp. ("KBK Huntington"), a New York corporation.   KBK Huntington has owned the Site from approximately 1965 through the present, during which time hazardous substances were disposed of at the Site.   Birchell managed and directed KBK Huntington and made decisions about compliance with environmental laws and regulations at the Site.   Main Street Cleaners leased the Site from KBK Huntington.

## STATUTORY BACKGROUND

9.   Under CERCLA, when there is a release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release as long as the State's response actions are "not inconsistent with the national contingency plan."   42 U.S.C. § 9607(a).

10.   "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that the U.S. Environmental Protection Agency ("EPA") has designated as hazardous pursuant to 42 U.S.C. § 9602.   These substances are listed in 40 C.F.R. § 302.4.

---

[1] Main Street Cleaners underwent various corporate name changes while operating at the Site.   From 1997 until it dissolved, it operated at the Site under the corporate name Country Cleaners Inc.

3

11. A "release" includes spilling, leaching, and disposing "into the environment." *Id.* § 9601(22). The "environment" includes groundwater, land surface, and subsurface strata. *Id.* § 9601(8).

12. A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It also includes buildings, structures, and equipment. *Id.*

13. The term "respond" includes taking "removal" actions, "remedial" actions, and related enforcement activities. *Id.* § 9601(25). A "removal" action includes the "cleanup or removal of released hazardous substances from the environment" as well as the assessment and evaluation of a release. *Id.* § 9601(23). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

14. The "national contingency plan" is set forth in 40 C.F.R. Part 300.

15. The persons liable for response costs under 42 U.S.C. § 9607(a) include: (i) current owners and operators of a facility; and (ii) owners and operators of a facility at the time of disposal of hazardous substances. "Persons" includes individuals and corporations. 42 U.S.C. § 9601(21).

16. 42 U.S.C. § 9613(g)(2) provides that in an action for response costs under CERCLA, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages."

## FACTUAL ALLEGATIONS

**The Site**

17.  The Site is located at 410 West Main Street in Huntington, Suffolk County, New York, at the southeast corner of West Main Street and Hillside Avenue.  The Site is identified on the Suffolk County tax map as District 400, Section 69, Block 3, Lot 1.

18. The Site occupies approximately 9,500 square feet and consists of a parking area at the north side of the property, which is adjacent to West Main Street, and an approximately 3,600-square foot single story building at the south side of the property, with a driveway behind the south side of the building.  The Site is bordered by residential properties to the south and west and a large residential complex across the street to the north.  Commercial properties are located along West Main Street.

19. The Site has been used for dry cleaning since approximately 1965.  Until approximately 2004, Birchell and successive owners and operators of Main Street Cleaners used the solvent tetrachloroethylene ("PCE")[2]  as the cleaning agent in dry cleaning machines at the Site.

20. Between approximately 1965 and 2004, PCE was disposed of and released at the Site.  PCE and its breakdown products, trichloroethene ("TCE") and 1,2-dichloethene ("1,2-DCE"), leached into groundwater at the Site and migrated into groundwater off-site.

---

[2]  PCE is also identified by the chemical names tetrachloroethene and perchloroethylene, and is often colloquially referred to as "perc."

21. EPA has designated PCE, TCE, and 1,2-DCE as hazardous.  40 C.F.R. § 302.4.

22. PCE is likely carcinogenic.  Short-term acute exposure to PCE can cause dizziness, headaches, unconsciousness, and even death.  PCE can be toxic to the central nervous system, kidney, liver, reproductive system, and developing fetuses.

23. TCE is a carcinogen that may cause kidney cancer, liver cancer, and malignant lymphoma.  Short-term exposure to high concentrations of TCE can cause dizziness, headaches, lack of coordination, unconsciousness, liver damage, possible kidney damage, and even death.

24. Short-term exposure to high concentrations of 1,2-DCE can cause nausea, drowsiness, and even death.

25. The Site is located above a "sole source aquifer" that is Long Island's primary source of drinking water.  The Site is adjacent to the area where precipitation enters the ground and replenishes the ground water that is the source water of a nearby public water supply well.  Groundwater at the Site migrates in a northeasterly direction toward multiple other public water supply wells and Huntington Harbor, which connects to Long Island Sound.

### Dry Cleaning Operations at the Site, 1965–1975

26. As of the early 1960s, defendant Birchell and his late father owned and managed a dry cleaning and laundry business that operated at multiple locations on Long Island.  The Birchells also held ownership interests in various commercial properties—including the properties at which some or all of their dry cleaning

branches were located—through single-asset corporations that they owned together with their business partners.

27. In approximately 1965, Birchell and his business partners acquired ownership of the Site through KBK Huntington, the corporation they established for that purpose and which they jointly owned.  They purchased the Site to expand Birchell's dry cleaning and laundry business to a new location.  Birchell arranged for the building at the Site to be constructed to house the new cleaning operations.

28. In approximately 1965, Birchell established Main Street Cleaners to conduct dry cleaning and laundry operations at the Site.

29. From approximately 1965 through 1975, Birchell directed and managed Main Street Cleaners.

30. Birchell's office was located above his dry cleaning location in Plainview, New York, a short distance from the Site.  Birchell visited the Site several times a week to supervise the dry cleaning operations at Main Street Cleaners.

31. Prior to commencing business at the Site, Birchell arranged for the installation and setup of equipment and supplies necessary for dry cleaning and laundry operations there.  These included a cleaning machine and its filtration system, a dryer, and a solvent reclaiming machine.

32. Birchell made all personnel decisions for Main Street Cleaners, which had approximately five employees at the Site at any given time between 1965 and 1975. Non-party Phillip Pennestri was the primary employee at the Site, and he reported directly to Birchell.

33. Birchell made all purchasing and equipment decisions for dry cleaning operations at the Site.  For instance, in approximately 1970, Birchell made the decision to replace the dry cleaning machine that Main Street Cleaners was then using.  Birchell also arranged for the dry cleaning equipment to be serviced when necessary.

34. Birchell was also responsible for property management of the Site.  For example, he obtained local permits for the boiler in the building; he arranged for regular garbage pickup; and he paid the Site's utility bills.

35. Between approximately 1965 and 1975, the first step in Main Street Cleaners' dry cleaning operations was to put clothing inside the cleaning machine to be cleaned with PCE.  During a cleaning cycle, vaporized PCE was pumped through the cleaning machine.  Dirty solvent passed through a carbon-based filtration system as it circulated to remove dirt, oil, and other impurities.

36. When Main Street Cleaners began doing business, it stored PCE fluid in a tank outside at the rear of the building at the Site.  Birchell arranged for a supply truck to refill the tank approximately once per week.  After several years, Birchell arranged for the outside storage tank to be removed, and instead for PCE to be delivered in 55-gallon drums that were dropped off at the Site inside the building next to the dry cleaning machine.  Main Street Cleaners used a pump to transfer PCE from drums to the dry cleaning machine.

37. Birchell made note of supplies that were low, including PCE fluid and PCE filtration supplies, so that he could place orders to restock them.

38. The second stage in Main Street Cleaners' dry cleaning operations was to transfer clothing into its drying machine to evaporate remaining PCE.  A solvent reclaiming machine was connected with the dryer to capture and distill vaporized PCE.  The distillation process produced liquid PCE that discharged into a bucket. Main Street Cleaners transferred this PCE for reuse by pouring the contents of the bucket back into the cleaning machine.  The solvent reclaiming machine's distillation process also produced condensate wastewater that Main Street Cleaners poured down a drain connected to the municipal sewer system.

39. Approximately once or twice per week, Main Street Cleaners removed the used, PCE-containing contents of the cleaning machine filter and placed them into the solvent reclaiming machine to distill out usable PCE.  This process left behind a residue containing PCE that Main Street Cleaners disposed of into a dumpster outside at the rear of the Site building, together with other garbage generated at the Site.  Birchell arranged for a waste hauling company to empty the dumpster at the Site approximately once or twice per week.

40. Dumpsters can leak or spill as a result of weather events, corrosion, improper handling, and other causes.

41. Disposal of PCE occurred at the Site during the period between 1965 and 1975 that Birchell directed Main Street Cleaners.

**Dry Cleaning Operations at the Site, 1975–2004**

42. In approximately 1975, Birchell sold Main Street Cleaners to then-employee Phillip Pennestri's father, non-party Domenick Pennestri.   KBK Huntington continued to own the Site.

43. Main Street Cleaners continued to conduct dry cleaning operations at the Site.  It continued to use PCE, generate PCE-contaminated waste, and dispose of it at the Site.

44. In a March 1982 inspection, the Suffolk County Department of Health Services ("Suffolk DHS") discovered that Main Street Cleaners was improperly disposing of spent filter cartridges and residue from dry cleaning operations.  Suffolk DHS directed Main Street Cleaners to cease all discharge of sludge and condensate water from the facility.

45. In approximately 1987, Domenick Pennestri sold Main Street Cleaners to non-party Thomas Giordano.  Main Street Cleaners continued to use PCE, generate PCE-contaminated waste, and dispose of it at the Site.  KBK Huntington continued to own the Site.

46. In a May 1993 inspection, Suffolk DHS discovered that Main Street Cleaners was improperly storing drums containing PCE-contaminated filter cartridges outdoors.  Suffolk DHS directed Main Street Cleaners to ensure that PCE-contaminated waste condensate from dry cleaning operations would not be discharged to the ground or down a drain.

47. Drums stored outside can leak, overflow, or spill as a result of weather events, corrosion, or improper handling.

48. In an October 1997 inspection, Suffolk DHS noted that Main Street Cleaners was holding dozens of spent filter cartridges for pickup.  In a November 1997 inspection, Suffolk DHS noted that filter cartridges had been improperly stored outdoors.

**Dry Cleaning Operations at the Site, 2004–Present**

49. In approximately 2004, Main Street Cleaners replaced its dry cleaning equipment with machinery that did not use PCE.

50. Non-party Giordano continued to own and manage Main Street Cleaners through approximately 2006.

51. In or around 2006, Main Street Cleaners ceased operating at the Site. Since that time, a non-party dry cleaning business has operated at the Site under a lease with KBK Huntington.  The new business has not used PCE in its operations at the Site.

52. Birchell is now the sole shareholder of KBK Huntington, which continues to own the Site.

**Suffolk DHS's Investigation of the Site**

53. Between 1997 and 2000, Suffolk DHS discovered PCE contamination at the Site in soil samples collected from behind the Site building.  Suffolk DHS also detected PCE, TCE, and 1,2-DCE contamination in groundwater samples collected from monitoring wells behind the Site building and off-site to the east-northeast of

11

the Site—that is, in the direction of the groundwater flow—in front of the neighboring gas station.

54. Between approximately 1997 and 2002, Suffolk DHS directed Birchell, KBK Huntington, Main Street Cleaners (at that time named Country Cleaners), and Giordano to address PCE contamination at the Site.  Birchell and Giordano met with Suffolk DHS on multiple occasions and hired a contractor to remove some contaminated soil.  Subsequent tests confirmed the continued presence of PCE contamination at the Site.

**State Response Actions and Costs Incurred**

55. In 2003, DEC listed the Site as Site No. 152187 in the Registry of Inactive Hazardous Waste Disposal Sites in New York State.  DEC designated the Site as "Class 2," denoting that the Site poses a significant threat to the public health or environment and requires response action.  *See* New York Environmental Conservation Law § 27-1305.

56. In January 2007, DEC staff referred the Site to New York's Inactive Hazardous Waste Disposal Site Program ("State Superfund Program") for the development and implementation of a remedial investigation and feasibility study in order to evaluate the nature and extent of contamination at the Site and to assess potential remedial options.

57. DEC evaluates the contamination of soil and groundwater under the State Superfund Program in reference to threshold levels established by DEC's Standards, Criteria and Guidance for Investigation and Remediation of Inactive Hazardous

Waste Disposal Sites ("DEC standards"), which are developed by DEC and other state and federal agencies to protect human health and the environment.

58. Between 2008 and 2010, a DEC contractor conducted a remedial investigation of the Site. The investigation identified a plume of volatile organic compounds originating beneath the Site and migrating with groundwater flow to the north and northeast. Subsequent groundwater sampling detected PCE in substantial excess of DEC standards at the Site and in locations to the east and northeast of the site. The sampling also detected TCE and 1,2-DCE, believed to be the breakdown products of the PCE, in excess of DEC standards at these same sampling locations.

59. In December 2011, DEC published the results of the remedial investigation.

60. In January 2012, DEC issued a feasibility study report evaluating response options to address the contamination identified in the remedial investigation.

61. On March 30, 2012, DEC issued a Record of Decision ("ROD") for the Site. In its ROD, DEC selected a remedy for the contamination at the Site consisting of "in-situ chemical oxidation" targeting groundwater at the Site and near the Site, to be followed by "in-situ bioremediation" at the Site, near the Site, and at affected off-site locations in the direction of groundwater flow.

62. In-situ chemical oxidation is a process by which a chemical oxidant is injected into the subsurface to break down contaminants into benign compounds. In-situ bioremediation is a process by which microorganisms are injected into the

subsurface to break down contaminants by using them as a food source or co-metabolizing them with a food source.

63. The ROD also required the development and implementation of a site management plan providing for certain controls at the Site, including engineering controls to monitor groundwater and soil vapor to assess the effectiveness of the remedy, and to evaluate and address the risk of soil vapor migration into indoor air above the plume.

64. The ROD further required the imposition of an easement to allow industrial and commercial use and development of the property subject to restricted groundwater use, a prohibition on agriculture and vegetable gardening, and implementation of the site management plan.

65. On August 20, 2013, DEC staff referred the Site to the State Superfund Program for the implementation of the remedy selected in the ROD.

66. On September 2, 2014, DEC issued an approval letter for the work assignment to begin implementing the selected remedy.

67. In late 2014 and into 2015, a DEC contractor conducted a pre-design investigation to evaluate site-specific conditions necessary to implement the selected remedy, and to pilot test the selected remedy. In December 2015, DEC issued a report for the pre-design investigation, with the recommendation to proceed with the selected remedy according to the findings of the site evaluation and pilot test.

68. In the summer of 2018, a DEC contractor installed injection wells at the Site for in-situ chemical oxidation. In the fall of 2019, a DEC contractor conducted

initial injections for in-situ chemical oxidation.  After evaluating the results of the injections, DEC may determine that additional injections are necessary.  After the completion of in-situ chemical oxidation, DEC will proceed to in-situ bioremediation at the Site, near the Site, and at affected off-site locations in the direction of groundwater flow.

69. The State has incurred costs in excess of $1,000,000 in responding to the release of hazardous substances at the Site.  The State estimates that it will incur additional future costs in excess of $1,000,000 in responding to the release of hazardous substances at the Site.

**CLAIM FOR RELIEF**
**COST RECOVERY UNDER CERCLA**

70. The State hereby incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

71. The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

72. Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Site are also "facilities" under 42 U.S.C. § 9601(9).

73. There have been "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Site and other facilities at the Site into the environment.

74. Among the hazardous substances that were released into the environment at and from the Site and other facilities at the Site are PCE, TCE, and 1,2-DCE (the "contaminants of concern").

15

75. The contaminants of concern contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

76. The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release of the contaminants of concern at and from the Site and other facilities at the Site, including costs to assess, monitor, evaluate, oversee, and conduct "remedial actions," as that term is defined in 42 U.S.C. § 9601(24).

77. 42 U.S.C. § 9607(a) provides that (i) persons who are current owners or operators of a facility and (ii) persons who were owners or operators at the time that hazardous substances were disposed shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

78. The response actions that the State has taken and will take to respond to the release of hazardous substances at the Site are not inconsistent with the "national contingency plan." *See* 40 C.F.R. Part 300.

79. Both defendants are "persons" within the meaning of 42 U.S.C. § 9601(21).

80. Birchell managed and directed operations at the Site and other facilities at the Site, including dry cleaning operations and other operations specifically related to pollution and the leakage and disposal of hazardous substances, when hazardous substances were disposed at the Site, and thus is an operator of the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

81. KBK Huntington owns the Site currently and owned the Site when hazardous substances were disposed at the Site, and thus is the current owner of the

Site within the meaning of 42 U.S.C. § 9607(a)(1) and the owner of the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

82. Under 42 U.S.C. § 9607(a), both defendants are strictly, and jointly and severally, liable to the State for past response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

83. Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g), both defendants are strictly, and jointly and severally, liable for future response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against both defendants, upon the claims set forth above, and requests that this Court enter judgment against the defendants, as follows:

1. Declaring both defendants to be strictly, and jointly and severally, liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

2. Declaring both defendants to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees, and other costs of enforcement to be incurred by the State

in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

     3.    Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated:     New York, New York
             January 14, 2020

                LETITIA JAMES
                Attorney General of the State of New York
                *Attorney for Plaintiffs*

                By:  /s/ Channing Wistar-Jones

                Assistant Attorney General
                Environmental Protection Bureau
                28 Liberty Street, 19th Floor
                New York, New York 10005
                (212) 416-8082
                channing.jones@ag.ny.gov